**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 24-20140-CR-ALTMAN**

**UNITED STATES OF AMERICA**

  **v.**

**TOCHUKWU ALBERT NNEBOCHA,**
     **a/k/a "Nnebocha Albert Tochukwu,"**
     **a/k/a "Albert Tochukwu,"**
     **a/k/a "Too," a/k.a "Tochukwu,"**

               **Defendant.**

                                /

## SENTENCING MEMORANDUM

The government submits this sentencing memorandum for defendant Tochukwu Albert Nnebocha who is scheduled to be sentenced on February 6, 2026. Nnebocha is the third defendant in this matter to stand before the Court for sentencing. Nnebocha pleaded guilty to conspiracy to commit mail and wire fraud in connection with a multi-year inheritance fraud scheme that stole millions of dollars from hundreds of vulnerable adults. Six of Nnebocha's co-conspirators were sentenced previously in *United States v. Ezennia Peter Neboh*, et. al, Case No. 1:22-cr-20134-WILLIAMS. For the reasons discussed below, the government recommends that the Court sentence Nnebocha to 97 months of incarceration, which is the low end of the applicable Guidelines range and aligns with the 97-month sentences received by both of his co-defendants who have been sentenced by Your Honor. The government submits that such a sentence would be a just result that is sufficient, but not greater than necessary, and appropriately accounts for the factors set forth in 18 U.S.C. § 3553(a). The court should also order the defendant to pay $6,860,784.11 in restitution to his 411 victims in the amounts specified in the addendum to the presentence investigation report.

**FACTUAL BACKGROUND**

Defendant Nnebocha admitted to these facts in support of his guilty plea:

Tochukwu Albert Nnebocha, his six co-defendants, the co-defendants in Case No. 1:22-cr-20134 (Ezennia Peter Neboh, Emmanuel Samuel, Jonathan Abraham, Kennedy Ikponmwosa, Jerry Chucks Ozor, and Amos Prince Okey Ezemma),[1]  and others (collectively, "his co-conspirators") operated an inheritance fraud scheme to steal money from elderly and otherwise vulnerable Americans.  Beginning in at least May 2021 and continuing through at least several of his co-conspirators' April 2022 arrests, Nnebocha and his co-conspirators engaged in a scheme to defraud by mailing hundreds of thousands of letters to elderly or otherwise vulnerable Americans, among others.  The letters falsely represented that the recipients were entitled to receive an inheritance from a long-deceased family member, or from an attorney representing an elderly woman dying in an overseas nursing home.  Throughout the course of the scheme, more than 400 victims in the United States were fraudulently convinced to send more than six million U.S. dollars in advance fees for, among other things, costs to deliver the inheritance funds, purported taxes, and various bogus certificates, before they could receive their alleged inheritances.

During the conspiracy, Nnebocha resided in Madrid, Spain, where he was integrally involved in the fraudulent inheritance scheme.  Nnebocha's role in the fraud scheme included communicating directly with victims, formatting, printing, packaging, and mailing letters to victims, and inducing victims to make advance payments in order to receive their alleged inheritance.

As part of the conspiracy, Nnebocha, who resided in Madrid, Spain, and his co-conspirators, who resided in London, United Kingdom, Madrid, Spain, and elsewhere, obtained

---

[1] The defendants in that case participated in the same scheme until their April 2022 arrests.

the names and contact information of potential victims in the United States, including victims located in the Southern District of Florida, from a list broker, who sold lists of potential victims' contact information to the members of the conspiracy.  The lists included the contact information for many elderly U.S. consumers who were older than 65 years old.  Nnebocha and his co-conspirators used these lists to create personalized inheritance solicitations to send to the potential victims in the United States as part of the conspiracy to defraud.

Nnebocha and his co-conspirators used fictitious aliases, such as "Sofia Gomez," "Isabella Morales" and other aliases, to pose as a manager of a bank in Spain when sending the letters.  In the letters, Nnebocha and his co-conspirators falsely and fraudulently informed the recipients that they were entitled to receive a $26.7 million dollar inheritance left in a Spanish bank by an individual who shared the recipient's last name and who died, either in a car accident overseas, or in the 2004 Madrid bombings.  Using aliases, Nnebocha and his co-conspirators falsely posed as employees of the bank holding the alleged inheritance money and purported to advise victims about how to apply for and obtain inheritance funds.  The letters provided an email address, telephone, and fax number for the fictitious sender and encouraged victims to respond to one of them to obtain their alleged inheritance.

When victims responded to these letters, Nnebocha and his co-conspirators communicated with the victims via email and telephone.  In these communications, Nnebocha and his co-conspirators, using aliases, directed victims to fill out an application with their personal information to obtain the inheritance, and falsely claimed that they would prepare documentation on behalf of the victims in order for the bank to release the inheritance to the victims.  Nnebocha and his co-conspirators then sent victims documents purporting to be from the Spanish Government's Ministry of Justice that claimed to be sworn statements and court orders certifying

that the victims were the rightful heirs to a deceased individual and were entitled to inherit the decedent's money. In these communications, Nnebocha and his co-conspirators used additional aliases, such as "Gerald Martinez," "Gerrard Martinez," and "Oscar Lozano," to pose as employees of the foreign remittance department of a Spanish bank.

After victims sent their alleged application to receive their inheritance to the fictitious bank employees, Nnebocha and his co-conspirators falsely and fraudulently informed victims via email and telephone that they needed to pay an initial fee for the cost of alleged delivery fees, usually totaling thousands of dollars. When victims paid this initial fee, Nnebocha and his co-conspirators informed the victims via email, telephone, and international mail that they had to pay separate fees for taxes, anti-terrorist and money laundering certificates, and payments to avoid questioning from government authorities in order to receive their supposed inheritances. The advance fees escalated from a few thousand dollars to tens of thousands of dollars. Nnebocha and his co-conspirators induced many elderly victims to pay many thousands of dollars.

Throughout the conspiracy, Nnebocha and his co-conspirators instructed victims to send money to couriers in the United States via various methods, including check, cash, money order, and wire transfer. Often, the couriers had been previously victimized by Nnebocha and his co-conspirators as part of the scheme but could no longer afford to make additional payments to obtain their alleged inheritances. Nnebocha and his co-conspirators informed these victim-couriers that other individuals would send them payments to help offset the costs that they supposedly owed to receive their inheritances. Nnebocha and his co-conspirators instructed these victim-couriers to deposit victims' checks and money orders, withdraw U.S. currency, tape U.S. currency into the pages of magazines, books, and other documents, and ship those items to Nnebocha and his co-conspirators through various means, including directly to the co-conspirators.

As part of the conspiracy, Nnebocha and his co-conspirators collected more than six million dollars from many victims, including elderly and vulnerable victims, in the United States, but victims never received their alleged inheritance funds.

## GUIDELINES CALCULATION

In the plea agreement, the parties agreed that Nnebocha's Sentencing Guidelines range should be calculated, after acceptance of responsibility, at an Offense Level of 30. Plea Agreement, Dkt. No. 101 ¶ 8. The Probation Office agreed with this analysis. Draft PSR, Dkt. 112. If the Court adopts these Guidelines, given Nnebocha's Criminal History is within Category I, his advisory guidelines range should be calculated at 97-121 months of incarceration.[2]

## SENTENCING FACTORS

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *See United States v. Gall*, 552 U.S. 3849 (2007). Pursuant to 18 U.S.C. § 3553(a), the court shall impose a sentence that is sufficient, but not greater than necessary to comply with the purposes of the statute which include the need for the sentence: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training. In addition, the statute requires the court to consider a

---

[2] Like each of his already-sentenced co-defendants in this case and in the related case before Judge Williams, Nnebocha does not benefit from the new "zero-point offender" guideline, U.S.S.G. § 4C1.1. U.S.S.G. § 4C1.1 expressly rejects the application of the two-point reduction where a defendant "personally caused substantial financial hardship," or where a defendant received an adjustment under § 3A1.1 (Hate Crime Motivation or Vulnerable Victim). U.S.S.G. § 4C1.1(a)(6), (9)). As noted in the PSR and Nnebocha's plea agreement, the parties jointly recommended that Nnebocha receive a four-point enhancement because the defendant knew that victims of the offense were vulnerable and because his offense involved a large number of vulnerable victims resulting in an increase of 4 offense levels under Sections 3A1.1(b)(1) and (2). Further, Nnebocha, like his co-defendants, personally caused substantial financial hardship to numerous victims. Thus, for multiple reasons, the two-point "zero-point offender" reduction does not apply.

number of factors in determining the appropriate sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the purposes of the statute; (3) the kinds of sentences available; (4) the sentencing guidelines; (5) policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims.

### A.    Nature and Circumstances of the Offense

Nnebocha participated in a scheme that defrauded hundreds of victims and that spanned the course of several years.  The scheme was sophisticated, it was targeted, and it was successful in robbing numerous innocent Americans of their savings and retirements.  Because the fraud proceeds in this matter did not transit traditional banking channels, tracing the proceeds is challenging.  But the government has traced more than $6,500,000 from more than 400 victims that Nnebocha and his co-conspirators stole from vulnerable victims who were duped into sending money to futilely chase the life-altering possibility of the $26.7 million inheritance that the defendants promised them.

The evidence of Nnebocha's involvement is detailed and overwhelming.  Indeed, the evidence shows that Nnebocha was a full-time participant in the fraud scheme, with evidence of his involvement beginning as early as 2021 and ran at least until the day of his co-conspirators' April 2022 arrests.  Throughout the scheme, Nnebocha worked closely with defendants in both cases identified above and in various countries including Nigeria, Spain, and the United Kingdom.

Nnebocha also communicated with victims and induced them into sending advanced payments to receive their promised inheritance.  Nnebocha used email accounts and phone numbers bearing U.S. telephone numbers as well as various aliases to communicate with victims and dupe them into making payments as part of the scheme.  He directed victims to make payments, sent additional letters and documents intended to persuade those same victims to make

6

additional payments, and helped direct victim payments to various locations intended to help launder the proceeds and hide his and his co-conspirators' involvement.

The government has heard from many of the victims in this case, and those victims have described the serious financial hardship as well as lasting mental and emotional harm that the defendants inflicted upon them.  For example, victim M.C.M. was a 94-year-old woman who received a letter about a $26.7 million dollar inheritance.  The defendant's co-conspirators convinced M.C.M. to send $250,000 to receive her alleged inheritance.  M.C.M. explained that her husband had just passed away and the money the defendants convinced her to send to them left her "broke."  She further explained that she lived in fear that she does not "know how to make it sometimes."

The financial hardship and emotional toll described by M.C.M. is illustrative of the hardship experienced by many elderly Americans defrauded by Nnebocha and his co-conspirators.  As M.C.M. described: "I'm dealing with depression and despair now because I cannot communicate this fraud that I've gotten myself into to a family member or friend."  Isolation, coupled with the fear of being perceived as not being able to care for oneself physically or financially, is one reason why fraudsters target elderly Americans.  M.C.M.'s experience reflects that the toll of these crimes was not just financial; Nnebocha and his co-conspirators emotionally traumatized M.C.M. and others who should otherwise be enjoying the fruits of a lifetime of hard work and the love of their families in the sunset years of their lives.  And that they did so throughout the course of the coronavirus pandemic, at a time when many individuals were living under challenging and often solitary conditions, is particularly egregious.

The Court has also received a victim impact statement from Victim D.R.  D.R. explained that because of defendant's victimization of him, his "life has become a struggle so many different

ways." *See* SEALED D.R. Victim Impact Statement, Dkt. No. 48. D.R. "suffered with great expenses" including having to obtain loans to cover his losses to the defendants' scheme and paying taxes for early withdrawals from his retirement accounts. *Id.* Over the course of numerous letters, emails, facsimiles, and phone calls, members of the conspiracy stole $178,045 from D.R. for bogus costs, taxes, and fees they alleged were required by foreign governments in order for him to receive his alleged inheritance. D.R. explained that he has also been severely affected with "undue emotional stress" as well as mental and physical difficulties. *Id.* Nnebocha and his co-conspirators caused substantial financial hardship for additional victims who reported having emptied their retirement savings, having to work when they would otherwise be retired, needing to obtain loans, and being unable to afford their rent after falling victim to the defendants' scheme.

The defendant's deliberate efforts to defraud these vulnerable victims profoundly affected their lives and should be considered by the Court in determining an appropriate sentence that reflects the need to protect vulnerable members of society, to deter others from engaging in similar fraudulent conduct, and to punish those who knowingly sought out and preyed upon elderly Americans for profit. Consequently, a sentence within the sentencing guidelines range is an appropriate punishment based on the seriousness of the defendant's offense, and the need to provide just punishment.

**B.      History and Characteristics of the Defendant**

A guidelines sentence is also appropriate in light of the history and characteristics of the defendant. Nnebocha, like many of his co-conspirators, made a living doing fraud. Nnebocha continued to scam elderly and vulnerable Americans through the April 2022 arrests of five co-conspirators in the related prior case, and assisted one of those conspirators with hiding evidence of his involvement when he learned that Spanish authorities were preparing to arrest him that day.

8

Nnebocha faces sentencing at the same advisory sentencing guidelines range as the two defendants sentenced previously in this case. Like those defendants, Nnebocha was personally and intimately involved in preying on vulnerable victims in the scheme and he did many of the same things those defendants did in furtherance of the scheme.

And, the evidence reflects that Nnebocha and his co-defendants were well-aware of those arrests and closely followed the details of the prosecution in the earlier case involving six of his co-conspirators before Judge Williams. Nnebocha shared copies of press releases and news articles tracking the extraditions and sentences issued by Judge Williams in the earlier case with co-defendants in the case pending before this court and others. He also continued to correspond with those co-defendants about the scheme into at least November 2022, including by sharing solicitation letters.

Though Nnebocha deserves credit for his timely acceptance of responsibility by promptly pleading guilty, he knowingly participated in a fraud scheme for an extended period of time, and his intentional decision to continue to commit egregious crimes preying on vulnerable Americans reflects the seriousness of his crimes, the history and characteristics of the defendant, and the need to specifically deter this defendant from re-engaging in fraud after his custodial sentence.

### C. Deterring Criminal Conduct and Protecting the Public

The seriousness of this multiyear criminal scheme, the defendant's role in those long-running crimes, and the fact that he persisted in facilitating those crimes despite knowing serious consequences that applied to them all merit a substantial sanction to protect the public and deter further such crimes.

Nnebocha's role was not minor. Between 2021 and 2022, he was responsible for responding to letters sent to at least 7,500 U.S. victims. Those letters directed the recipients to

respond to email addresses and telephone number that Nnebocha controlled and used to defraud elderly victims into relinquishing their life savings under false pretenses.

Furthermore, there is an important need to deter transnational criminals from participating in similar scams that prey on American victims from abroad.  Nearly one quarter of Americans reported falling victim to cyber scams in 2023.  Washington Post staff, *Myanmar's scam centers require a global response*, THE WASHINGTON POST, February 10, 2025.  Many victims of these scams do not report their own victimization.  *Id.*  The elderly are frequent victims of such scams and on average lose more than twice as much money as a typical fraud victim loses.  *Id.*  The number of adults aged 60 or older who lost $100,000 or more to fraud schemes tripled between 2020 and 2024.  Michelle Singletary, *Enter the 'ether,' where scammers weaponize your emotions*, THE WASHINGTON POST, December 2, 2024.  In 2024, the FTC tallied over $10 billion in victim losses due to fraud schemes.  Washington Post staff, *Scammed How a con man stole a woman's life's savings*, THE WASHINGTON POST, December 2, 2024.  A recent FTC report estimated that total American fraud losses may now exceed over $100 billion annually.  William Webster and Lynda Webster, *Scams are on the rise, and they're ruining lives*, THE WASHINGTON POST, March 25, 2024.

As many fraudsters commit their crimes from locations outside the United States, it takes years to bring a successful prosecution to fruition.  These efforts require courageous victims, dedicated investigators, detailed indictments, extradition treaties, engagement with U.S. officials involved in international affairs, and foreign assistance.  None of that is to be taken for granted.  That defendants like the one before the Court continued to commit these crimes in the face of ongoing prosecutions of their friends, family members, and co-conspirators necessitates a substantial sanction to deter them and others from continuing to do so.  The problem of

transnational fraud schemes is increasingly pervasive, causing a growing number of older Americans to lose more of their hard-earned money in recent years, such that this conduct merits a sanction that sends a strong message of general deterrence as well.

General Deterrence is a key consideration in a fraud case like this one.  The Eleventh Circuit has commented on the particular need for general deterrence in fraud cases

> General deterrence is more apt, not less apt, in white collar crime cases.  The reason is that 'economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity,' which makes them 'prime candidates for general deterrence.'

*United States v. Howard*, 28 F. 4th 180, 209 (11th Cir. 2022) (quoting *United States v. Kuhlman*, 711 F. 3d 1321, 1328 (11th Cir. 2013).  The Eleventh Circuit has instructed district courts to consider imposing "serious punishment" to "send a message" as a "primary objection" in determining sentence in fraud cases.  *Kuhlman*, 711 F. 3d at 1328.  These considerations apply with great weight in this case.

### CONCLUSION

For the reasons stated above, the government recommends a sentence at the low end of the applicable guidelines range:  97 months of imprisonment with credit for the time served in U.S. and Polish custody since the defendant's April 16, 2025 arrest.  A sentence of 97 months is just and sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).  The defendant should also be ordered to pay $6,860,784.11 in restitution to his 411 victims. Such a sentence would appropriately reflect the seriousness of the offense, provide deterrence to transnational criminals who seek to prey upon American citizens from locations abroad, protect vulnerable members of society, and promote respect for the law.

Dated: January 30, 2026        Respectfully submitted,

JASON REDING QUIÑONES
UNITED STATES ATTORNEY

LORINDA I. LARYEA
Chief, Fraud Section
Criminal Division

**/s/ *Phil Toomajian***
Philip M. Toomajian
Senior Trial Attorney
Transnational Criminal Litigation Coordinator
Joshua D. Rothman
Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section
Court ID Nos. A5501275, A5502447
1400 New York, NW, Washington, D.C.  20005
Tel. 202 532-4300; 202 514-1586
Email: Philip.Toomajian@usdoj.gov
Joshua.D.Rothman@usdoj.gov

12